MBANK HOUSTON, NATIONAL ASSOCIATION, Plaintiff,

v.

ARMCO, INC., Defendant.

The DEPOSIT INSURANCE BRIDGE BANK, etc., et al., Plaintiffs,

A.W.H., I, Ltd., Plaintiff–Appellant,

v.

ARMCO, INC., Defendant–Appellee.

Nos. 90–2723, 91–2884 and 92–2496.

United States Court of Appeals, Fifth Circuit.

Sept. 2, 1993.

---

Roger Townsend, Janice Kemp, Fulbright & Jaworski, B.J. Walter, Jr., Nathan, Wood & Sommers, Houston, TX, for plaintiff-appellant in No. 90–2723.

Stephen D. Susman, E.L. Vincent, Susman Godfrey, L.L.P., Bradley Westmoreland, Westmoreland & Crain, Houston, TX, for defendant-appellee in Nos. 90–2723, 91–2884.

Roger Townsend, Fulbright & Jaworski, B.J. Walter, Jr., Nathan, Wood & Sommers, Houston, TX, for plaintiff-appellant in No. 91–2884.

Roger Townsend, Fulbright & Jaworski, Marvin D. Nathan, David Lee Crawford, B.J. Walter, Jr., Nathan, Wood & Sommers, Houston, TX, for plaintiff-appellant in No. 92–2496.

Stephen D. Susman, Susman Godfrey, L.L.P., Bradley Westmoreland, Westmoreland & Crain, Houston, TX, for defendant-appellee in No. 92–2496.

Before JOLLY and DAVIS, Circuit Judges, and LEE,[1] District Judge.

E. GRADY JOLLY, Circuit Judge:

These appeals arise from a "build-to-suit" transaction in which A.W.H.–I, Ltd. ("AWH")[2] constructed an office building complex in Houston, Texas ("the Enclave"), pursuant to the specifications of Armco, Inc., for the worldwide headquarters of its National Supply Company Division. Although Armco entered into a 15–year lease, it never moved in. It did pay rent for four months, but then returned the keys to the developer, AWH. The central issue that we must decide is whether AWH may recover damages for lost equity, cash flow, and a construction lender's deficiency judgment, notwithstanding the fact that the lender, which foreclosed and stepped into AWH's shoes as landlord, has already recovered from Armco, for rents due under the remainder of the lease term, an amount in excess of the deficiency judgment. After carefully considering the voluminous record, the briefs, and the arguments of counsel, we AFFIRM the judgment of the district court.

I

In 1983, National Supply Company, a division of Armco, solicited bids for the construction of a new worldwide headquarters facility. After considering over 40 proposals, Armco chose AWH as the developer for the project. In March 1984, Armco and AWH signed an agreement to enter into a lease agreement. Capital Bank, N.A.[3] ("the Bank") approved an interim construction loan to AWH in the amount of $23,600,000, guaranteed by AWH's principals, Ward and Hail. AWH acquired the land, which was pledged to the Bank as collateral, along with an adjacent 5.9–acre tract that AWH had acquired for itself in connection with the transaction. In addition, the Bank also took a lien on the planned buildings and an assignment of Armco's lease in the event of a default by AWH. AWH planned to pay off the construction loan with a long-term non-recourse loan that would insulate its principals from personal liability.

In September 1984, the Teachers' Retirement System of Texas (TRS) issued AWH a conditional Permanent Loan Commitment for a 30–year, non-recourse loan of $22,400,000. The Permanent Loan Commitment contemplated three disbursements. The first disbursement, $15,222,000, was to be made upon completion of the building shells, and TRS' receipt of a sworn estoppel certificate from

1. District Judge of the Southern District of Mississippi, sitting by designation.

2. "AWH" is an acronym for Armco, Ward and Hail. The "I" designated that it was the first of what Ward and Hail hoped would be a series of ventures with Armco.

3. Capital Bank is MBank Houston's predecessor in interest by merger. MBank later was declared insolvent, and the Federal Deposit Insurance Corporation was appointed as receiver. The lease then was sold to Deposit Insurance Bridge Bank, which later changed its name to Bank One, Texas, N.A.

Armco in a form satisfactory to TRS, stating that:

    (i) ARMCO, Inc. accepts the lease shell without qualification; (ii) the Lease between [AWH] and ARMCO, Inc. is binding and is in full force and effect; (iii) ARMCO, Inc. is unconditionally obligated to perform all obligations in accordance with the terms stated in the Lease; (iv) ARMCO, Inc. is unconditionally obligated to pay all rentals as stated in the Lease beginning on a date certain not later than six (6) months after the date of this estoppel certificate regardless of whether ARMCO, Inc.'s tenant finish is completed; and (v) ARMCO, Inc. does not nor will it ever have a right to offset any rentals due and owing under the Lease because of any delinquency in the completion of ARMCO, Inc.'s tenant finish.

The second disbursement, approximately $6,100,000, was to be funded after completion by Armco of the tenant finish, and TRS' receipt of a sworn estoppel certificate from Armco stating that:

    (i) ARMCO, Inc. accepts the lease premises and tenant finish without qualification; (ii) the lease between [AWH] and ARMCO, Inc. is binding and is in full force and effect; (iii) ARMCO, Inc. is unconditionally obligated to pay all rentals and to perform all other obligations as stated in the lease agreement; and (iv) ARMCO, Inc. is occupying the lease premises and paying rent in accordance with all terms and provisions of the Lease.

The third disbursement, up to a maximum of $1,000,000, was to be made upon completion of any additional shell construction work AWH agreed to provide to Armco.

Paragraph 15 of the Permanent Loan Commitment prohibited AWH from seeking other permanent financing during the term of the commitment:

    You agree not to apply for, or accept, a commitment for or any other financing for the Property during the term of this commitment; provided that you shall be entitled to obtain an interim construction loan from Capital Bank.

The expiration date for the permanent loan commitment was February 15, 1986, the same day that the Bank's construction loan matured.

On September 26, 1984, Armco and AWH entered into a Lease agreement, for a term of 15 years, with options to renew the Lease for three additional 5–year terms.[4] The Lease was an "absolute net lease," which meant that Armco was responsible for paying the taxes, insurance, and operating costs for the leased premises. The Lease provided that AWH would be responsible for construction of the "shells" of the three buildings, and Armco would be responsible for completing the interior finish, for which it would be reimbursed by AWH out of proceeds from the construction loan. The Lease also provided that Armco would execute a subordination agreement to facilitate AWH's mortgage financing.

Section 20.08 of the Lease, which deals with estoppel certificates, provides:

    Landlord and Tenant hereby agree to execute and deliver to the other on forms prepared by the requesting party, at any time or times as either may reasonably request, and without further consideration being payable by the party requesting same:

    (a) a certificate or certificates evidencing whether (i) this Lease is in force and effect, (ii) this Lease has been modified or amended in any respect, and if so, submitting copies of such modifications or amendments, (iii) there are, within the knowledge of the party executing the certificate, any existing defaults hereunder, and, if so, specifying the nature of such default, and (iv) any other reasonable information relating to this Lease as the party receiving the request may practicably furnish....

Section 17.02 of the Lease sets forth the landlord's remedies in the event of a default by Armco.

Armco and AWH also executed on September 26, 1984, a "Termination of Agreement to Enter into Lease Agreement," providing that neither "shall have any further liability, obli-

---

**4.** The useful life of the buildings was expected to . be 45 years.

gation or responsibility to the other by reason or in consequence of the [Agreement to Enter Into Lease Agreement]." That same day, AWH, Armco, and the Bank signed a Subordination, Non-disturbance and Attornment Agreement ("Subordination Agreement"). In the Subordination Agreement, Armco agreed not to terminate the Lease without cause without the prior written consent of the Bank, and agreed, in the event of acquisition of the building through foreclosure or otherwise, to recognize the new owner as landlord under the Lease. The Subordination Agreement also provided that Armco would furnish estoppel certificates that conformed to the requirements of the Permanent Loan Commitment.

The final transactional document is a Tri-Party Agreement, executed on September 26, 1984, by the Bank, AWH, and TRS. In that document, TRS acknowledged that it had reviewed and approved the Lease between Armco and AWH.

AWH completed its work on the building shells ahead of schedule and under budget. It turned the buildings over to Armco for the tenant finish work in the summer of 1985. Out of the proceeds of the construction loan, AWH was paid a developer's fee of $900,000, and Hail received over $300,000 in real estate commissions for selling the land on which the buildings were constructed and an adjacent tract sold to Armco for expansion purposes.

In July 1985, AWH sent to Armco a draft of a first disbursement tenant estoppel certificate. One of Armco's staff attorneys in Houston indicated that the estoppel certificate was acceptable and would be executed subject to the final punch list. However, that estoppel certificate was not executed, because AWH decided to close the permanent loan with a single disbursement after the tenant finish work was completed.

In October 1985, Armco informed AWH that it did not intend to move into the new facility, but assured AWH that it intended to honor its commitments under the Lease. A month later, at a meeting with AWH's principals, R.M. Fletcher, Armco's Corporate Director—Real Estate and Equipment Divestments, read a prepared position statement, which included the following:

3. Armco NSC is not moving into the Enclave Building. You deserve to be advised of why—on a non-public basis.

(a) Armco NSC work force is drastically cut. A recent review of the building requirements of Armco make it clear that there is no need for the Enclave Building in our requirements.

(b) Armco NSC will move to a new location by year end and will require approximately 80,000 square feet or less. They must fight for survival on the basis of their own efforts.

(c) NSC is for sale and their new lease is a short term 3–year lease. This space requirement, type and term of lease did not fit the pattern of utilization or cost of the Enclave Building.

(d) The Enclave is an Armco corporate responsibility for resolution.

4. Purpose of meeting:

(a) We do not now have the professional management personnel in Armco to market and manage the Enclave space for long term for the benefit of either Armco or [AWH]. This staff can be acquired, if necessary.

(b) We do not have a landlord type of ownership interest. It would be difficult to perform as a landlord without an interest in the Enclave. There is no financial incentive to Armco so our position would likely be to get by at the least cost and take best pay tenants only, with no concern as to the building image.

. . . .

5. Armco is in a fight for survival in one of the most risky basic businesses in the *world*. . . . We cannot and will not offer your permanent lenders any additional security for payments. As a general creditor you must recognize the secured creditors have substantial prior claims on Armco assets.

6. Armco does not want to manage and sublease the Enclave Building.

7. We want out of the lease now and on a permanent basis.

On December 6, 1985, Armco's Board of Directors approved termination of the Enclave Lease.

In early December 1985, AWH sent to Armco the form of Tenant Estoppel Certificate requested by TRS pursuant to the Permanent Loan Commitment. Armco did not execute the form furnished by TRS, but instead drafted an estoppel certificate containing the following paragraphs:

8. Tenant has provided Landlord written notice that due to changes in Tenant's commercial conditions, Tenant has no use and does not intend to occupy the Leased Premises.

9. Tenant has negotiated in good faith with Landlord to terminate the Lease and has made an offer of approximately $9,500,000 to Landlord.

In addition, the estoppel certificate stated that Armco's obligations under the Lease were expressly conditioned upon AWH's payment to Armco of approximately $6,100,000 (approximately $3,700,000 of which had already been paid). On December 30, AWH sent Armco a check for approximately $2,800,000, the balance of the $6,100,000 requested by Armco, plus approximately $400,000 in interest savings under the construction loan.[5] AWH requested that Armco delete paragraphs 8 and 9 from the estoppel certificate.

On January 3, 1986, Armco sent AWH another executed estoppel certificate, which contained the following paragraphs (similar to paragraphs 8 and 9 of the December 23 certificate):

7. Tenant provided Landlord written notice on October 9, 1985 that Tenant had no use for and did not plan to occupy the Leased Premises.

8. Tenant has negotiated in good faith with Landlord in an attempt to terminate the Lease and remove Tenant from any further involvement with the Leased Premises. Subject to approval by Tenant's Board of Directors, Tenant has made

an offer to Landlord to terminate the Lease on the following terms:

a. Tenant will refund the sum of $2,831,566.99 which Landlord has paid to Tenant under the terms of the Lease; and

b. In addition, Tenant will pay Landlord approximately $9,500,000 in cash.

Under the terms of this offer, Tenant's total payment to Landlord will be $12,331,566.99.

AWH forwarded that certificate to TRS. On January 22, 1986, TRS sent AWH another estoppel certificate for submission to Armco.

On January 27, Armco sent AWH another estoppel eertificate in which paragraphs 7 and 8 of the January 3 certificate had been deleted. Two days later, AWH's counsel sent Armco the certificate that had been sent to AWH by TRS on January 22. On January 31, AWH's counsel advised Armco that the January 27 estoppel certificate was not in a form acceptable to TRS. Armco responded on February 5, enclosing another executed estoppel certificate, including language identical to paragraphs 7 and 8 of the January 3 certificate. AWH immediately advised Armco that the February 5 estoppel certificate was unacceptable, and reminded it that the Permanent Loan Commitment would expire on February 15. On February 10, Armco responded, stating that it considered certain paragraphs of the estoppel certificate drafted by TRS to constitute unauthorized amendments to the lease, and offering to delete the other objectionable paragraphs upon receipt of certification that the information contained in them had been communicated to TRS.

AWH requested an extension of the Permanent Loan Commitment, but TRS refused. On February 15, 1986, the construction loan matured and the TRS Permanent Loan Commitment expired. TRS refused to fund the loan because it knew that Armco did not intend to comply with its obligations under the Lease.

AWH rejected Armco's offers to buy its way out of the Lease for $9,500,000 to $12,000,000, because its principals were still per-

---

5. In the Lease, AWH and Armco agreed upon a formula pursuant to which Armco would receive a credit against rent if interest on the construction loan did not exceed a specified amount.

AWH decided to pay the interest savings to Armco in cash instead of applying it in the form of rent concessions. The $2,800,000 payment is the basis of AWH's fraud claim.

sonally liable to the Bank for $23,600,000 on the interim construction loan.

Although it did not move into the buildings, Armco paid rent, utilities, and maintenance for the first four months of 1986. On March 18, 1986, AWH and the Bank each notified Armco that they considered Armco to be in default under the Lease because it had failed to furnish acceptable estoppel certificates to TRS. On March 27, Armco sent AWH a check for the April rent, but returned the keys to the buildings and informed AWH and the Bank that it considered itself to have been constructively evicted and, therefore, would no longer pay rent, utilities, maintenance, or insurance on the building.

Without the permanent loan, AWH could not pay the interim construction loan. Accordingly, on August 6, 1986, the Bank foreclosed on the property. Pursuant to the Subordination Agreement, the Bank stepped into the shoes of the landlord, AWH. On August 15, 1986, the Bank declared the Lease terminated pursuant to Section 17.02(a).

## II

The Bank sued Armco in federal court for breach of the Lease, seeking rent for the remainder of the Lease term. In a separate suit in state court, the Bank sued AWH for a deficiency on the construction loan, and sued Armco for breach of the Subordination Agreement. The state court suit was removed to federal court and consolidated with the Bank's other lawsuit. AWH cross-claimed against Armco for breach of the Subordination Agreement, tortious interference with the Permanent Loan Commitment, and fraud for failure to disclose that it had decided to terminate the lease when it induced AWH to pay $2.8 million to it in December 1985. AWH was realigned as a plaintiff. Pursuant to a settlement agreement entered into prior to trial, AWH conditionally assigned its claims against Armco to the Bank,[6] and the Bank agreed to satisfy the deficiency judgment out of the funds it recovered from Armco.

After a nine-week trial, the jury, in response to special interrogatories, rejected Armco's defenses to the Bank's claim for rent pursuant to Section 17.02(a) of the Lease, and awarded the Bank damages of $19,793,265. With respect to AWH's claims, the jury found that Armco breached the Subordination Agreement, and that such conduct was the proximate cause of the foreclosure of the Enclave and the deficiency judgment in favor of the Bank against AWH ($16,589,028.75 plus interest at the rate of 10% per annum from December 19, 1988, until paid); AWH's loss of equity damages of $8,157,158.00; and AWH's loss of cash flow damages of $4,059,966.00. The jury further found that Armco tortiously interfered with AWH's Permanent Loan Commitment, that Armco's interference was not privileged, and that Armco's conduct was the proximate cause of the foreclosure of the Enclave and the deficiency judgment, loss of equity, and loss of cash flow. It found, however, that Armco's tortious interference was not malicious. In addition, the jury found that Armco committed fraud when it failed to disclose that it intended to terminate the Lease when demanding cash payments from AWH under the terms of the Lease in December 1985, proximately causing AWH actual damages of $4,026,677.00. The jury awarded punitive damages of $8,000,000, based on its finding that Armco's failure to disclose was committed with actual malice or with reckless disregard for the rights of AWH. Finally, the jury found that AWH was entitled to $1,750,000 as reasonable and necessary attorney's fees. The jury rejected Armco's affirmative defenses and counterclaims.

The district court entered judgment for the Bank for over $27 million. It denied

6. According to the terms of the settlement, AWH's assignment of its claims to the Bank was conditioned upon the Bank's failure to recover from Armco an amount sufficient to satisfy the deficiency judgment. If its recovery from Armco was insufficient, the Bank agreed to satisfy the deficiency judgment out of any recovery that AWH might secure from Armco. The agreement between AWH and the Bank provided that the assignment was to be of no further force and effect in the event that the Bank recovered an amount from Armco sufficient to satisfy the deficiency judgment. As we explain *infra,* that eventuality has occurred.

Armco's motion for JNOV as to the Bank, but granted Armco's motion for JNOV as to all of AWH's claims. The district court also conditionally granted Armco's motion for a new trial on AWH's claims and, in a separate order, awarded Armco costs against AWH. AWH appeals from each of these rulings.

The Bank subsequently accepted $25,000,-000 from Armco in satisfaction of its judgment. Pursuant to an order of limited remand, the district court conducted a hearing and found that the deficiency judgment was satisfied on July 23, 1990, by Armco's payment to the Bank, in accordance with the settlement agreement between AWH and the Bank. AWH also appeals from these findings.

### III

Our review of the judgment notwithstanding the verdict is governed by the standard set forth in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (*en banc*):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence— not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.... A mere scintilla of evidence is insufficient to present a question for the jury.... However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and

inferences, and determine the credibility of witnesses.

*Id.* at 374–75.

### A

The jury found that Armco breached the Subordination Agreement by (1) failing to provide the estoppel certificates required by the Permanent Loan Commitment, and (2) by terminating the Lease without cause sometime between March 27, 1986 (the date on which Armco returned the keys to the Enclave) and August 15, 1986 (the date on which the Bank, following foreclosure, declared the Lease terminated pursuant to § 17.02(a) of the Lease); it also found that such breaches proximately caused the foreclosure and deficiency judgment, and AWH's loss of equity and cash flow. It awarded damages of $8,157,158 for loss of equity, and $4,059,966 for loss of cash flow. The jury awarded identical damages based on its finding that Armco tortiously interfered with AWH's Permanent Loan Commitment from TRS by failing to furnish acceptable estoppel certificates.

In granting JNOV, the district court held that there was insufficient evidence to support the jury's findings with respect to breach of the Subordination Agreement and tortious interference claims, with the exception of the finding that Armco breached the Subordination Agreement by terminating the Lease without cause. The district court held that the damages sought by AWH were not caused by either a breach of the Subordination Agreement or by Armco's tortious interference with the Permanent Loan Commitment, but by Armco's failure to pay rent. Accordingly, it concluded that the damages awarded to AWH duplicated the Bank's damages, and constituted an impermissible double recovery from Armco.[7]

For purposes of this discussion, we will accept AWH's argument that the evidence fully supports the finding that Armco, by failing to furnish the estoppel certificates, breached the Subordination Agreement and

---

7. To the extent that the district court was referring to Lease rental payments as a remedy for breach of the Subordination Agreement, we agree that such payments cannot be recovered both by the Bank, for breach of the Lease, and by AWH, for breach of the Subordination Agreement.

tortiously interfered with the Permanent Loan Commitment, which caused the loss of permanent financing and AWH's inability to pay the Bank, resulting in the foreclosure and AWH's loss of the Enclave.

AWH primarily contends that the district court's approach rejected the standard·*expectancy* measure of damages for breach of contract, *i.e.,* the damages that it argues flow from Armco's failure to furnish acceptable estoppel certificates. AWH asserts that it is entitled to recover damages that would put it in the same financial position that it would have occupied had Armco not prevented the funding of the permanent loan. AWH argues that, if the estoppel certificates had been furnished to TRS, which would have assured permanent financing, it reasonably could have expected that:

> 1. There would have been no deficiency judgment against it;
>
> 2. It would have retained its rights under the Lease, including the right to assert a cause of action against Armco for damages under § 17.02 of the Lease;
>
> 3. It would have been entitled to receive Lease rental payments from Armco for 15 years;
>
> 4. It would have been entitled to receive Lease rental payments for the years 16 through 30 (either from Armco if it exercised its renewal options, or from another tenant), and for the years 31 through at least 45 (from another tenant);
>
> 5. At the end of 30 years, it would have owned, free and clear of liens, the Enclave and the land upon which it sits; and
>
> 6. It would have retained all benefits flowing from rental of the Enclave for 30 years, minus the cost of the long-term, fixed-interest TRS permanent loan.

■ At the outset, two points are absolutely clear. First, as AWH concedes, it is not entitled to recover damages from Armco pursuant to § 17.02 of the Lease (item 2).

Only the Bank, as substitute landlord, had the right to collect damages from Armco pursuant to § 17.02 of the Lease. To the extent that AWH is arguing (its argument is vague and undeveloped on this point) that expectancy damages include damages from the right it would have enjoyed under § 17.02 if permanent financing had been obtained, its argument assumes that TRS, unlike the Bank, would not have foreclosed. This measure of damages is completely speculative on its face, because AWH presented no convincing evidence that, in the face of the loss of Armco as a tenant, TRS, as an ordinary prudent lender, would not have exercised its right to foreclose, especially in the light of the market conditions we discuss hereinafter. Second, and similarly, AWH is not entitled to recover any damages that are dependent on the fulfillment of the Armco Lease and rental payments by Armco under the Lease (item 3), because such damages are based on the flawed assumption that Armco would not have breached the Lease if TRS had funded the permanent loan.[8] Items 3, 4, and 6 are the basis for AWH's claim for damages for lost cash flow, and item 5 is the basis for its claim for lost equity.

■ We therefore turn to examine the remaining damages AWH argues flow from the loss of the permanent loan from TRS. Because the permanent loan was a non-recourse loan, we agree that there would have been no deficiency judgment against AWH and its principals if foreclosure had occurred . after the permanent loan had closed. Accordingly, accepting AWH's argument that its loss of permanent financing was the proximate cause of the foreclosure and the deficiency judgment entered against it, AWH should be entitled to recover the amount of the deficiency judgment from Armco. Alas, however, there is the settlement agreement between AWH and the Bank that undermines this theory of recovery.

---

8. AWH asserts that, if the permanent loan had closed, Armco might have been willing to offer a more reasonable amount for termination of the Lease, because it would not have had the leverage created by the potential personal liability of AWH's principals. This assertion is simply too speculative to survive scrutiny. AWH presented no evidence of how much more Armco would have been willing to offer under such circumstances, how long it would have taken to consummate such a settlement, and whether any offer would have been sufficient to prevent foreclosure by TRS.

In their settlement agreement, the Bank and AWH agreed that "the amount of any sums received by [the Bank] from Armco as a result of any judgment or settlement of [the Bank]'s claims against Armco arising out of Armco's breach of the Lease or Attornment Agreement shall be credited against the amount due under the Deficiency Judgment...." The Bank assigned its rights respecting the deficiency judgment to Armco on July 20, 1990. Three days later, the Bank received $25,000,000 from Armco in settlement of the Bank's judgment against Armco.

AWH contends that the district court erred in finding that the deficiency judgment has been satisfied. It points out that the Bank assigned its rights respecting the deficiency judgment to Armco prior to the Bank's receipt of the $25,000,000 payment from Armco, and that the Bank cannot release the deficiency judgment against AWH because it no longer owns it. AWH asks that we affirm the award of damages for the deficiency judgment so that AWH can then pay it to Armco, the current "owner," when Armco seeks to enforce the judgment. We decline the invitation to engage in such a meaningless ritual. At oral argument, Armco's counsel represented to the court that the deficiency judgment does not exist, and that Armco has no claim against AWH on the deficiency judgment. We thus affirm the district court's finding that the deficiency judgment has been satisfied. Accordingly, AWH is not entitled to recover damages from Armco for the deficiency judgment.

█ The remaining components of damages claimed by AWH are consequential damages for lost cash flow (derived from the excess of rental payments—from Armco for 15 years and from Armco or another tenant for 15 more years—less amortization payments for 30 years) and for lost equity (the value of the land and buildings once the permanent loan was paid off at the end of the 30–year term). In order to establish these damages, AWH cannot rely solely on the loss of the TRS permanent loan and assume that acquiring the permanent loan would have reasonably assured the cash flow and equity that it claims to have lost. The stark fact is that the permanent loan would only have

substituted a non-recourse debt to TRS for the debt to the Bank, guaranteed by AWH's principals. Although the terms of the loans were different, AWH was no less obligated to repay the TRS loan than it was obligated to repay the Bank loan. And, yet, the fact remains: if the permanent loan had been funded by TRS as scheduled on February 15, 1986, AWH would still have had no tenant. Indeed, it was on March 27, 1986 that Armco announced its intention to quit paying rent. In August 1986, the Bank foreclosed.

The record shows that, during the relevant time period, the Houston real estate market was suffering. The Bank's expert witness testified that it would take approximately one and one-half years to lease a building like the Enclave in that particular market. Even if a new tenant could have been located to replace Armco, AWH would have had to offer concessions in the form of free rent or tenant finish and move-in allowances. Furthermore, market rental rates at that time were far lower than the rates Armco had agreed to pay under the Lease, and far lower than necessary to service the debt with TRS.

In order to avoid loss of the building through foreclosure by TRS, and own the buildings free and clear of liens at the end of the 30–year loan term, AWH would have had to locate a new tenant or tenants, who would agree to pay above-market rent, in an amount sufficient to make the mortgage payments to TRS. Other than speculation and conjecture, there is no basis to assume that the buildings could have been leased at rental rates sufficient to pay the mortgage, or that TRS would not have foreclosed, just as the Bank did, with the same consequences to the rights of AWH. If TRS had foreclosed, AWH would have, as in the case of the Bank foreclosure, lost the land and buildings and the expectation of profits from future rental payments. The only difference between the two foreclosures is that there would have been no deficiency judgment against AWH if foreclosure had occurred after the permanent, non-recourse loan had closed. As we have already explained, however, because of its settlement with the Bank and Armco's payment to the Bank, AWH has suffered no

**1449**

damages as the result of the deficiency judgment.

Even if we assume, however, that TRS would not have foreclosed, we nevertheless would conclude that the damages awarded to AWH for loss of cash flow and lost equity are further based on speculative evidence offered by AWH's economist. The economist's opinion regarding the losses of cash flow and equity suffered by AWH is, first, based on the premise that the property would be leased to Armco for 15 years at the rates specified in the Lease, second, assumes that the property would have been leased to another tenant at the end of the Armco lease term, at the same rental rate specified in the Lease for years 11 through 15 of Armco's term, and, finally, assumes no changes in the current tax laws through the year 2016. As we have already discussed, any calculation of damages based on the assumption that Armco would be the tenant is unsupportable, because AWH, as the result of the foreclosure by the Bank, has no right to recover rent from Armco under the terms of the Lease.[9] It is further speculative to assume that any long-term lease could have been negotiated with another tenant on terms anywhere near as favorable as those provided for in the Armco Lease. The final factor that, in our view, destroys any basis for the so-called expectation damages urged by AWH is that, at the end of the 15–year Armco lease term, AWH would have still owed TRS over $25,000,000.

Finally, with respect to the claim for damages for the 15–year period after the expiration of the Armco lease, suffice it to say that, particularly in the light of our discussion above, only rank speculation supports AWH's argument. We agree with the district court that the damages awarded for that period are simply not supported by any competent evidence.[10]

**B**

The jury found that Armco knowingly failed to disclose material facts, i.e., that Armco had no intention of fulfilling its obligations under the Lease, when it induced AWH to pay money to it in December 1985. The jury awarded damages of $4,026,677. It also found that Armco's failure to disclose was committed with actual malice or with reckless disregard for AWH's rights, and awarded punitive damages of $8,000,000. The district court granted Armco's motion for JNOV on the fraud claim on the grounds of insufficient evidence and double recovery.

We need not consider the sufficiency of the evidence of fraud, because, even assuming that it is sufficient, AWH has suffered no damages from the alleged fraud. The money that Armco induced AWH to pay came from the proceeds of the construction loan. Accordingly, that payment had the effect of increasing the amount of the deficiency judgment that was ultimately taken against AWH. Of course, this deficiency judgment

9. Although AWH's claims for damages for lost cash flow and lost equity are purportedly based on breach of the Subordination Agreement and tortious interference with the Permanent Loan Commitment, its calculations of these damages are based on the rental payments provided for in the Armco Lease. Despite its concession that it has no right to recover from Armco under the Lease, AWH nevertheless is, in effect, seeking to recover rent due under the Lease.

10. The result we have reached, viewed superficially, may appear to be somewhat anomalous and even unjust. The Bank, which loaned AWH $23,600,000, sold the property for $8,000,000, and then recovered $25,000,000 from Armco for breach of the lease. AWH will not receive the difference between Armco's payment to the Bank and the amount of the deficiency judgment. It thus appears that the Bank made a profit that would have gone to the developers if Armco had honored its obligations. Evaluation of the equi-

ties, however, must take into account the fact that AWH financed 100% of the project through the Bank. As part of the bargain through which it obtained 100% construction financing, AWH pledged essentially its entire interest in the project as collateral. Out of these proceeds of the construction loan, AWH received a $900,000 developer's fee, and Hail earned over $300,000 in real estate commissions. Once AWH agreed to the mortgage terms and subordinated its rights as landlord to the Bank, it knew that if it could not repay the money it had borrowed, it would lose its ownership interest in the Enclave, as well as the right to sue Armco for breach of the Lease. In short, AWH and the Bank entered into a fairly-negotiated, arm's length agreement that included risks and benefits for both parties.

And finally, a review of the "equities" shows that Armco did not escape unscathed: it had to fork over $25,000,000 to the Bank as the result of its conduct with respect to the Enclave Lease.

ordinarily would serve as a basis for a damage claim. As we have fully explained, however, the deficiency judgment was satisfied by Armco's payment to the Bank, pursuant to the settlement agreement between AWH and the Bank. In sum, the money AWH was induced to pay Armco did not come out of AWH's pocket, and the deficiency judgment was satisfied at no cost to AWH. Consequently, AWH has failed to prove that it suffered any loss as the result of its payment of $2.8 million to Armco in December 1985. AWH has conceded that, in the absence of actual damages for fraud, the punitive damages award cannot stand.[11]

## IV

For the foregoing reasons, the district court did not err in granting Armco's motion for judgment notwithstanding the verdict as to the claims of AWH. Because the JNOV was proper, the district court did not abuse its discretion in awarding costs to Armco. The judgment of the district court is therefore

AFFIRMED.

---

11. Because we have affirmed the JNOV, it is unnecessary for us to address the conditional grant of a new trial.